HUBBELL INCORPORATED *v.* CITY OF
BRIDGEPORT ET AL.

HUBBELL INCORPORATED *v.* BOARD
OF TAX REVIEW OF THE CITY
OF BRIDGEPORT ET AL.
(15478)

Borden, Berdon, Katz, Palmer and McDonald, Js.

476

Argued December 12, 1996—officially released April 22, 1997

*Richard S. Scalo*, with whom were *Mark T. Anastasi* and, on the brief, *Abraham I. Gordon* and *Ronald D. Japha*, for the appellants (defendants).

*Robert J. Cooney*, for the appellee (plaintiff).

*Opinion*

BORDEN, J. This appeal is a companion to the appeal in *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 692 A.2d 742 (1997), decided today. The dispositive issues in this appeal are: (1) the scope of the authority of a municipal tax assessor to revalue and reassess personal property pursuant to General Statutes (Rev. to 1995) § 12-53 (b);[1] and (2) the propriety of the trial

---

[1] General Statutes (Rev. to 1995) § 12-53 provides: "Addition of omitted property to list. (a) During the period prescribed by law for the completion of their duties the assessor or board of assessors of each town shall add to the list given in by any person and made according to law any taxable property which they have reason to believe is owned by him and has been omitted from such list, and property so added shall be assessed at the

court's determination that, irrespective of the scope of
the assessor's authority under § 12-53 (b), the assessor's

percentage of the actual valuation thereof, as determined by the assessor
or board of assessors in accordance with the provisions of sections 12-63,
12-64 and 12-71, from the best information the assessor or board of assessors
can obtain, and twenty-five per cent of such assessment shall be added
thereto. The assessor or board of assessors shall notify such person, in
accordance with section 12-55, of any such increase in the assessed val-
uation.

"(b) If the assessor or board of assessors of any town believe that taxable
property has been omitted from the list given in by any person or that
taxable property belongs to any person who has not given in a list, or if
the assessor or board of assessors are unable to determine the value of any
property without the assistance of the owner, custodian or other person
having knowledge of the same, they may give notice in writing to the owner,
custodian or other person having knowledge of any such property or the
valuation thereof, of the time and place of a hearing with respect thereto.
Such notice shall, within three years after the due date for the filing of such
list or within three years after the date on which such list is received by
the assessor or board of assessors, if later, be placed in the hands of such
person or left at his usual place of residence or business or shall be sent
to him by registered or certified mail at his last-known place of residence
or business. Such notice shall direct the person named therein to appear
before the assessor or board of assessors with books of account, papers,
documents and other records for examination under oath relative to any such
property or the valuation thereof. All omitted taxable property, discovered at
such hearing or any adjournment thereof and not listed by the owner as
required by law, shall be added to his list by such assessor or board of
assessors at the percentage of its actual valuation, as determined by the
assessor or board of assessors in accordance with the provisions of sections
12-63, 12-64 and 12-71, and twenty-five per cent of such assessment shall
be added thereto. Subject to the provisions of sections 12-57 and 12-129, if
any property is discovered at such hearing or any adjournment thereof to
be listed in error by the owner, it shall be removed from such owner's list
by the assessor or board of assessors. No person shall be excused from
giving testimony or producing books of account, papers, documents and
other records on the ground that such testimony and such production of
documents will tend to incriminate him, but such testimony and such produc-
tion of documentary evidence shall not be used in any criminal proceeding
against him. Any person who fails to appear at the time and place of such
hearing in such notice designated or at any adjournment thereof, or, having
appeared, refuses to answer any pertinent question put to him or who fails
to produce the books, papers or other documents mentioned in such notice,
shall be fined not more than one hundred dollars or imprisoned not more
than thirty days or both. All property which the assessor or board of assessors
believes should have been listed for taxation and was not listed and concern-

reassessments were so arbitrary as to constitute a disregard of duty, and were manifestly excessive. The

ing which sufficient information cannot be obtained by them at such hearing, or any adjournment thereof, shall be added to the list at such percentage of the actual valuation thereof from the best information obtainable by the assessor or board of assessors and twenty-five per cent shall be added to such assessment.

"(c) If the assessor or board of assessors of any town adds property to the list of any person or makes out a list for any person not filing a list or increases or decreases the valuation of any taxable property under the provisions of subsection (b), they shall, within thirty days of such hearing or any adjournment thereof give him notice thereof in writing by mailing the same, postage prepaid, to his last-known address and the same shall be held to be sufficient.

"(d) Any person claiming to be aggrieved by the action of the assessor or board of assessors under this section may appeal the doings of the assessor or board of assessors to the board of tax review and the superior court as otherwise provided in this chapter, provided such appeal shall be extended in time to the next succeeding board of tax review if the statutory period for the meeting of such board has passed. Any person intending to so appeal to the board of tax review may indicate that taxes paid by such person for any additional assessment added in accordance with this section, during the pendency of such appeal, are paid 'under protest' and thereupon such person shall not be liable for any interest on the taxes based upon such additional assessment, provided (1) such person shall have paid not less than seventy-five per cent of the amount of such taxes within the time specified and (2) the board of tax review reduces valuation or removes items of property from the list of such person so that there is no tax liability related to additional assessment.

"(e) Upon receipt of notice from the assessor or board of assessors of the addition of property to the list of any owner, the tax collector of the town shall, if such notice is received after the normal billing date, within ten days thereafter mail or hand a bill to such owner based upon the property added by the assessor or board of assessors. Such tax shall be due and payable and collectible as other municipal taxes and subject to the same liens and processes of collection, provided (1) such tax for the current fiscal year shall be due and payable in an initial or single instalment due and payable not sooner than thirty days after the date such bill is mailed or handed to such owner and in any remaining, regular instalments as the same are due and payable, and the several instalments of the tax so due and payable shall be equal and (2) such tax for any prior fiscal year shall include interest from the date or dates such tax for the corresponding grand list would have been due."

Although § 12-53 has been amended by No. 95-283 of the 1995 Public Acts, the amendments are not relevant to this appeal. References to § 12-53 in this opinion are to the 1995 revision.

defendants[2] appeal from the judgment of the trial court, rendered after a court trial in two consolidated cases, in favor of the plaintiff, Hubbell Incorporated.[3] The defendants claim that the trial court: (1) misconstrued § 12-53, and thus unduly limited the assessor's statutory authority; and (2) erroneously determined that the reassessment in question was invalid as a factual matter. We agree with the defendants' first claim, which is controlled by our decision in *United Illuminating Co.*, and disagree with their second claim. We therefore affirm the judgment.

The plaintiff brought these two actions challenging the revaluation and reassessment by the tax assessor: (1) a tax appeal, pursuant to General Statutes (Rev. to 1995) §§ 12-117a and 12-53 (d),[4] following the Bridge-

---

[2] The defendants in this appeal are: (1) the city of Bridgeport; (2) the Bridgeport board of tax review; and (3) the Bridgeport tax assessor, tax collector, mayor and auditor. Century Financial Services, Ltd., which performed the audit in question pursuant to a contract with the city, and James Crozier, one of its principals, were also originally named as defendants in this case, but were dropped pursuant to a motion to dismiss.

[3] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[4] General Statutes (Rev. to 1995) § 12-117a provides: "Appeals from decisions of boards of tax review concerning assessment lists for assessment years commencing October 1, 1989, to October 1, 1992. Notwithstanding the provisions of sections 12-118, 12-121aa and 12-121bb, any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review in any town or city with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, or October 1, 1994, may, within two months from the time of such action, make application, in the nature of an appeal therefrom, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to

port board of tax review's denial of the plaintiff's appeal from the assessor's reassessment of the plaintiff's personal property on the grand lists of October 1, 1989, October 1, 1990, and October 1, 1991; and (2) an action for wrongful assessment, pursuant to General Statutes § 12-119,[5] claiming that the taxes assessed against the

prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court, and the pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and costs, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and costs. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and costs. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

Although § 12-117a has been amended by Nos. 95-220 and 95-283 of the 1995 Public Acts, and by Nos. 96-1 and 96-261 of the 1996 Public Acts, the amendments are not relevant to this appeal.

See footnote 1 for text of § 12-53 (d).

[5] General Statutes § 12-119 provides: "Remedy when property wrongfully assessed. When it is claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set, or that a tax laid on property was computed on an assessment which, under all the circumstances, was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property, the owner thereof or any lessee thereof whose

plaintiff as a result of those reassessments were manifestly excessive and imposed in disregard of the statutes regarding the valuation of such property. The cases were consolidated for trial, and the court made the following factual findings.

The plaintiff, a manufacturer of electrical equipment, has a place of business in Bridgeport. Since 1984, the plaintiff has filed its lists of business personal property with the assessor as required by law. These lists, provided to the assessor on standard forms, contain three categories of property: (1) machinery, equipment and tools; (2) furniture, fixtures and office equipment; and (3) computer equipment. For the tax year beginning October, 1989, the plaintiff listed the following values, which are at 70 percent of fair market value: machinery and equipment, $5,606,820; furniture and fixtures, $624,940; and computer equipment, $936,080. The total value of the property was $7,167,840. For the 1990 tax year, the comparable values were $5,379,110, $622,150, and $269,980, respectively, for a total value of $6,271,240. For the 1991 tax year, the comparable values were $5,188,700, $390,360, and $1,059,490, respectively, for a total value of $6,638,550.

In April, 1992, the city entered into a "Valuation Audit Agreement" with the defendant Century Financial Ser-

lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, prior to the payment of such tax, may, in addition to the other remedies provided by law, make application for relief to the superior court for the judicial district in which such town or city is situated. Such application may be made within one year from the date as of which the property was last evaluated for purposes of taxation and shall be served and returned in the same manner as is required in the case of a summons in a civil action, and the pendency of such application shall not suspend action upon the tax against the applicant. In all such actions, the Superior Court shall have power to grant such relief upon such terms and in such manner and form as to justice and equity appertains, and costs may be taxed at the discretion of the court. If such assessment is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes in accordance with the judgment of said court."

vices, Ltd. (Century), the principals of which are James Crozier and Jeffrey Coulson. This agreement provided that Century would provide certain auditing services, for which the city would pay it a flat fee of $375 per account, plus "25% of additional taxes . . . assessable by the City against any account with respect to personal property included (or which should have been included) on the city's [G]rand List prior to the October 1, 1991 Grand List, if such additional [t]axes relate to personal property identified or the assessed value of which is subject to increase as a result of Century's efforts. Such amount shall be paid within 30 days after Century has billed the City with respect to a particular [a]ccount."

On August 10, 1992, the plaintiff received a letter from the assessor informing the plaintiff that its October 1, 1991 personal property schedule had been selected for audit and that Century had been engaged to conduct the audit. The assessor's letter also informed the plaintiff that it "should be prepared to furnish Century . . . with applicable records pertaining to the Grand Lists of October 1, 1989, October 1, 1990, and October 1, 1991." Later in August, Century requested that the plaintiff supply data to support its personal property values. Within a few days, the plaintiff sent Century its worksheets and requested a meeting.

The plaintiff heard nothing further until September 15, 1992, when it received a notice from the assessor of changes in its assessments "per personal property tax audit." These changes in assessment were as follows: the assessed value of the plaintiff's personal property as of October 1, 1989, was increased from $7,167,840 to $9,301,275; the value of its personal property as of October 1, 1990, was increased from $6,271,240 to $8,734,600; and the value of its personal property as of October 1, 1991, was increased from $6,638,550 to $7,640,270.

The trial court found that Century, in reaching these reassessed values, "did little more than to take the plaintiff's business personal property statements and arbitrarily switch 'computer equipment' with 'furniture and fixtures,' which depreciates more slowly." The court also found that Century had no coherent explanation for its actions, that it had no legitimate reason for the switch, and that Century never examined the plaintiff's personal property or visited the plaintiff's facility. In addition, the court found that the documentation presented did not support Century's actions, and that the evidence presented to the court persuaded it that the plaintiff's classifications and valuations were correct. Finally, the court found that, at the time of Century's actions, the assessor was suffering from a serious illness, from which he has recovered, that any action he took with respect to these matters was purely formal, and that he was unable effectively to exercise his discretion and judgment at the time.

The court specifically noted that the defendants' case "is handicapped to the extent that [they have] had to rely on the testimony of one of the principals of Century," namely, Crozier. Relying particularly on the 25 percent contingency fee provision of the agreement between Century and the city, the court found that "Century's methodology is so indefensible and its interest in distorting data so evident that the evidence and testimony presented is not worthy of belief."

With regard to the plaintiff's legal claim, the trial court ruled that "§ 12-53 applies to claims where property was omitted from a return but not to claims relating to the valuation of property included in a return." With regard to the plaintiff's claim that the assessments made were manifestly excessive, the court agreed with the plaintiff that the assessments were arbitrary and in plain disregard of the assessor's duty, both because of the limitations of § 12-53 and as a factual matter. In effect,

therefore, the trial court ruled that, even if the assessor had the authority under § 12-53 to revalue property that had been included on a prior list, the reassessments in this case were manifestly excessive, and the plaintiff's valuations were correct. Accordingly, the court rendered judgment for the plaintiff on both its tax appeal from the board of tax review and its action under § 12-119. This appeal followed.

The defendants raise three claims on appeal. Their first claim is that the trial court misconstrued § 12-53 by limiting its scope to omitted property. The defendant's next two claims address the court's determination that the reassessments were arbitrary and manifestly excessive. Their second claim is that the court in effect improperly determined that the contingency fee agreement between the city and Century was against public policy, and that the court improperly refused to consider Crozier's testimony based on that improper determination. Finally, the defendants claim that the court misconstrued Crozier's function and thereby improperly rejected the reassessment.

We agree with the defendants' first claim. This issue is controlled by our decision today in *United Illuminating Co.* v. *New Haven*, supra, 240 Conn. 432, in which we held that a municipal tax assessor's authority under § 12-53 (b) is not limited to omitted property, and that the assessor has the authority under that statute to revalue previously assessed personal property.

We disagree, however, with the defendants' second claim, namely, that the court in effect improperly determined that the agreement with Century was invalid as contrary to public policy, and that the court improperly "refused to consider Crozier's testimony because of Century's contingent fee contract," because these claims are based on a misreading of the trial court's memorandum of decision. The court specifically did

*not* rule that the contract was invalid as against public policy, and did not refuse to *consider* Crozier's testimony because of the contract. The court, as it was permitted to do, simply took the contract into account in determining Crozier's credibility and the reliability of Century's methodology, a methodology that, by the trial court's unchallenged finding, the assessor in effect adopted because of his then serious illness.

It is true that, in an extensive footnote, the trial court noted the possibility that a financial audit based on a contingency fee agreement might violate principles of due process, even given de novo review by the courts. The trial court also noted that "appellate courts of other states have reached disparate conclusions as to whether contingent fee agreements violate public policy." The court noted further, however, that such a claim was not properly before the court, because in the trial court's view such a claim ought to be made by way of an action for declaratory judgment, with due notice to other interested parties subject to similar compensation agreements.

We neither reject nor endorse the trial court's dicta regarding the public policy implications of such a contract and the procedures by which such a contract may be challenged. We note them only to demonstrate that the trial court did not conclude that the agreement violated public policy, and did not refuse to consider Crozier's testimony based on any such conclusion.

The defendants' third claim relies to some extent on a reassertion of the contention that the trial court "could not arrive at a fair and impartial determination as to the credibility of the witnesses because of an erroneous determination that the contract under which the auditor performed was against public policy." We have already indicated that this contention is based on a misreading of the trial court's decision.

In addition, however, the defendants also challenge the trial court's finding that "the characterization or classification by the plaintiff in its personal property statements was at all times correct." The difference between the plaintiff's and the defendants' methodology was that the plaintiff's valuation of its computers was based on a five year depreciation schedule, whereas the defendants insisted on a seven year depreciation schedule. In this regard, the defendants argue that the trial court's determination was erroneous because: (1) the plaintiff never supplied the auditor with sufficient information regarding its depreciation methodology; and (2) the plaintiff did not use the depreciation schedule for computers "mandated by the City as approved by [the office of policy and management]."[6] We disagree.

We have recently reaffirmed that, in a tax case challenging the assessment of personal property, the taxpayer is entitled to de novo review by the court of the fair market value of the property, but that such review is triggered by the fulfillment of the taxpayer's obligation to supply the tax assessor with the facts upon which valuations may be based. *Xerox Corp.* v. *Board of Tax Review*, 240 Conn. 192, 204, 690 A.2d 389 (1997). In the present case, the plaintiff fulfilled its obligation to supply appropriate information to the taxing authorities by providing the assessor with lists of its taxable property containing estimates of the fair market value of that property, and by complying with Century's audit.

In addition, along with its original personal property lists, the plaintiff attached a document indicating the plaintiff's reliance on a five year depreciation schedule for its computers, "based on book depreciation guidelines and [Internal Revenue Service] guidelines." This document further explained that "[b]ecause a high

---

[6] The defendants do not challenge the propriety of the trial court's finding in any other respects.

degree of technological obsolescence is applicable to the . . . equipment, the . . . stated formula more clearly reflects the fair market value" of the equipment. Moreover, during the audit performed by Century the plaintiff supplied additional material to Century. The plaintiff sent Century the worksheets that supported the 1989–91 lists supplied to the assessor by the plaintiff, and offered to make available to Century its "tab runs,"[7] for review by Century at a mutually convenient time, an offer that Century never pursued. Finally, the evidence indicates that, during its audit, the plaintiff demonstrated to the assessor that Century had arrived at the increased assessments by reversing the depreciation schedules for computer equipment and furniture.

The defendants' reliance on the Handbook for Connecticut Assessors (Connecticut Association of Assessing Officers, Office of Policy and Management of the State of Connecticut and Institute of Public Service of the University of Connecticut, 1992 Ed.), is misplaced. The passage from the handbook cited by the defendants does not mandate any particular depreciation schedule; it simply points out that, in a given case, the depreciation allowed for federal income tax purposes may not be the same as that appropriately allowed for personal property tax purposes.[8] Indeed, the same

---

[7] "Tab runs" are detailed listings of equipment describing the asset in question, and showing its date of acquisition and original cost.

[8] The passage on which the defendants rely provides as follows: "Most depreciation schedules allow for a final residual value (i.e., items decline in value at a standard rate for a certain length of time and then continue to be assessed at the residual value). Accountants and/or owners may question this practice, since for purposes of the federal income tax items may be completely depreciated. It should be noted, however, that although the fields of accounting and appraisal utilize some of the same terms this does not necessarily mean that they have the same meanings ascribed to them. For accounting purposes, costs are written off over the useful life of a product as is required under the concept of matching expenditures with revenues. To an accountant, useful life means that period of time which is allowed by law or for federal income tax purposes by regulation for cost allocation. It should not be confused with the term 'economic life' which

passage also states that "not all personal property necessarily decreases in value with age. Also, items which may have unusually short economic lives (such as certain specialized equipment, *computer equipment* and video tapes) may decrease in value at a more rapid rate than other items of personal property." (Emphasis added.) Id., c. 10, p. 9. Ultimately, the value of property for personal property tax purposes is a question of fact, to be determined on de novo review by the trial court.

The judgment is affirmed.

In this opinion BERDON, KATZ and PALMER, Js., concurred.

MCDONALD, J., concurring. I agree that the judgment of the trial court should be affirmed.

I disagreed with the majority's application of General Statutes (Rev. to 1995) § 12-53 (a) and (b) to other than omitted personal property in *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 692 A.2d 742 (1997), and *Southern Connecticut Gas Co.* v. *Bridgeport*, 240 Conn. 469, 692 A.2d 771 (1997), and continue to express that position in this case.

This case illustrates the abuses to which the ruling in *United Illuminating Co.* could lead in the cases of other taxpayers where the taxing authority may wish to use a bounty hunter to valuate personal property, to go back three years and to add a 25 percent penalty.

I concur in the judgment.

---

is the length of time an item may be used for its intended purpose. Thus, an accountant may consider an item of equipment to have reached the end of its useful life after five years because it has been completely depreciated over that period of time on the owner's IRS return. To the assessor, however, this five year old item of equipment may still have many years of economic life remaining." Handbook for Connecticut Assessors, supra, c. 10, pp. 9–10.